## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JULIO VILLARS                                )
                                             )
            Plaintiff,                       )
                                             )       Case No. 12 CV 4586
      v.                                     )
                                             )       Judge Robert M. Dow, Jr.
STEPHEN KUBIATOWSKI as Assistant             )
United States Attorney for the Northern      )
District of Illinois; MAURY STRAUB as        )
Ozaukee County Sheriff; JEFFREY SAUDER       )
as Ozaukee County Jail Administrator; DOES   )
OZAUKEE COUNTY JAIL DEPUTIES 1-8;            )
COUNTY OF OZAUKEE; KENNETH                   )
COPPES, PATRICK MURRAY, and                  )
MICHAEL BARR as Village of Round Lake        )
Beach Police Officer; the VILLAGE OF         )
ROUND LAKE BEACH; GARY BITLER as             )
Round Lake Beach Police Chief; LAKE          )
COUNTY; MARK CURRAN as Sheriff of            )
Lake County; DOES LAKE COUNTY JAIL           )
DEPUTIES SHERIFF 9-13,                       )
                                             )
            Defendants.                       )

## MEMORANDUM OPINION AND ORDER

Before the Court are motions to dismiss Plaintiff's second amended complaint ("SAC")

[54], filed by Defendants Village of Round Lake Beach ("VRLB"), VRLB police officers

Kenneth Coppes, Patrick Murray, and Michael Barr, and VRLB police chief Gary Bitler

(together, "the VRLB Defendants") [58], Lake County, Lake County sheriff Mark Curran, and

Lake County jail deputies Scott Wilson and Dale Novarro, (collectively, "the Lake County

Defendants") [60], and Assistant United States Attorney Stephen Kubiatowski [83]. For the

reasons set forth below, the Court grants in part and denies in part the VRLB Defendants' motion

[58]; the Court denies the Lake County Defendants' motion in its entirety [60]; and the Court denies in part and grants in part Defendant Kubiatowski's motion [83].

Also before the Court is Plaintiff's "motion for certification to receive U-Visa certification" [79]. For the reasons set forth below, the Court denies Plaintiff's motion. This case is set for further status on May 20, 2014 at 9:00 a.m.

## I.    Background[1]

On October 10, 2010 at 8:28 p.m., *pro se* Plaintiff Julio Villars was arrested by police officers from the Village of Round Lake Beach ("VRLB") for driving under the influence and fleeing from VRLB officers after they effectuated a traffic stop of Villars's vehicle. SAC ¶ 30; SAC Ex. B, C. Officers initially pulled over Villars for speeding, but when they approached the driver side window, Villars sped away in his car, made a right turn, and then fled his vehicle on foot. *Id.* Soon after, the officers located Villars exiting a nearby backyard, at which point they detained and arrested him. *Id.* According to Villars, Officer Coppes referred to Villars as an "illegal Mexican" at the scene of his arrest and, when Villars refused to sign a traffic citation at the police station, Coppes told Villars that he would "be in Mexico by the time [Coppes] finished with [him]." SAC ¶¶ 33, 41.

Villars contends that, in fact, he was not an "illegal Mexican," but a Honduran citizen, lawfully in the United States and working as a confidential informant for the FBI. SAC ¶¶ 42, 50. According to Villars, VRLB officers removed from his wallet an Illinois Commercial Driver's License, social security card, Illinois state ID card, Immigration Work Authorization Card (I-765), and an "OIA Otherwise Illegal Activity" authorization card from the FBI. SAC ¶ 49. According to the police paperwork that Villars attached to his SAC, after completing the

---

[1] The facts are drawn from Plaintiff's second amended complaint. For the purposes of Defendants' motions to dismiss, the Court assumes as true all well-pleaded allegations set forth in the complaint. See *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

booking procedures, officers placed Villars in a cell "to be held for sobriety," and at 3 a.m. or 4 a.m., an officer awoke Villars to have him sign paperwork concerning his personal recognizance bond. SAC ¶ 55; SAC Ex. C. Villars asked the VRLB officer if he would be released, at which time the officer informed Villars that he would be transported to Lake County jail on an immigration detainer from U.S. Immigration and Customs Enforcement ("ICE"). SAC ¶ 56. According to Villars, the VRLB police department has an unlawful policy of honoring all ICE detainers, even when – in cases like this one, Villars contends – there are "easily verifiable fact[s]" of an arrestee's legal authorization to be in the United States. SAC ¶ 60. In Villars's case, ICE issued the detainer on October 10, 2010 (according to the detainer itself) to "Will County Sheriff 95 S. Chicago St. Joliet, IL 60436," informing its recipient that the Department of Homeland Security ("DHS") had initiated an investigation "to determine whether [Villars] is subject to removal from the United States" and requesting that the detainer's recipient "maintain custody of [Villars] for a period not to exceed 48 hours (excluding Saturdays, Sundays, and Federal holidays) to provide adequate time for [DHS] to assume custody of the alien." SAC Ex. F. The detainer asked that its recipient contact DHS "at least 30 days prior to [the Villars's] release or as far in advance as possible." *Id.*

Villars says that he was transferred to Lake County jail "around 3am" on October 11, 2010,[2] where Lake County, too, unlawfully detained him in compliance with ICE's directive. SAC ¶¶ 90, 108, 114. On November 10, 2010, Villars was taken to ICE's Chicago office, where he was transferred to the FBI pursuant to a material witness warrant and taken into custody by the U.S. Marshals Service. SAC ¶¶ 117-20. The U.S. Marshals Service then transferred Villars

---

[2] Plaintiff's SAC states that he was transferred on November 11, 2010, which – based on the supporting documentation attached as exhibits to the complaint (see Ex. B, C) and various other places in his SAC where he makes clear that these events took place in October (see SAC ¶¶ 80, 84-85) – appears to be a typographical error.

to Ozaukee County Jail in Port Washington, Wisconsin, where (according to Villars) the U.S. Marshals rent bed space to hold federal material witness detainees. SAC ¶¶ 121-22, 126. Villars contends that he was housed unlawfully with criminal defendants and subjected to invasive patdowns and strip searches, despite his status as a material witness detainee. SAC ¶¶ 134-35, 138.

Villars's SAC mentions that he was transported back to Chicago on November 15 for an unspecified reason. SAC ¶ 138. The docket in *U.S. v. Diaz*, 10-cr-0199, however, reveals that Villars made his initial appearance before Judge Denlow, (see [60]), concerning the material witness warrant that Judge Castillo issued on November 3, 2010, following a hearing on AUSA Kubiatowski's October 27 motion. See [54, 56]. In his motion, Kubiatowski represented to Judge Castillo that Villars's testimony in *U.S. v. Diaz* (a case in which Villars posed as a buyer of methamphetamine at the direction of the FBI) was critical to the government's prosecution of the defendants in that case and that Villars was facing imminent deportation proceedings, such that the government would be unable to secure his presence at trial with a subpoena and therefore needed a material witness warrant transferring Villars to the custody of the U.S. Marshals Service. See Kubiatowski Affidavit in *U.S. v. Diaz*, 10-cr-0199, [54-1]. At his initial appearance before Judge Denlow on November 15, Paul Flynn from the Federal Defender Program was appointed as Villars's counsel, and Judge Denlow scheduled a detention hearing for November 19. See [60]. When he returned to Ozaukee County Jail later that day, Villars tested positive for tuberculosis. SAC ¶¶ 142-44. But when Villars refused to undergo any additional medical evaluation, he was placed in isolation at the jail, (SAC ¶¶ 145-46), and (according to the docket in *U.S. v. Diaz*) Judge Denlow postponed his November 19 detention hearing (to be "reset at a later date") on account of his medical condition. See [65]. Villars, however, allegedly received

no information about his detention status or his next court date and had no contact with his attorney. After November 19, 2010, the next docket entry in *U.S. v. Diaz* concerning Villars was entered on January 6, 2011, when Judge Denlow scheduled a status hearing "as to material witness Julio Villars-Salazar" for January 11, 2011. [67].

A week or so before that, on December 30, 2010, after 50 days in Ozaukee County Jail, Villars had written Judge Castillo a letter, explaining his situation and requesting a detention hearing. SAC Ex. I. After several unsuccessful attempts to contact his attorney Paul Flynn, on January 7, 2011, Villars wrote a letter to Flynn, pleading for some type of assistance or information concerning his status. SAC Ex. J. According to the docket, Flynn withdrew as Villars's counsel at the January 11, 2011 status hearing (which Villars appears to have attended) and Ronald Clark was substituted for Flynn. See [69]; SAC ¶ 167. Judge Denlow set another status for January 13, at which time a status hearing was scheduled for January 27. [68, 70]. On January 27, 2011, Judge Denlow conducted a detention hearing as to Villars and, according to the docket, Villars was released from custody by agreement of the parties. See [74]. Villars says that he was returned to Ozaukee County Jail after the hearing, and was then transported back to Chicago on February 1, 2011, where he was released from detention. SAC ¶ 175.

Villars commenced this suit on June 13, 2012 and filed the twenty-one count second amended complaint [54] at issue here on August 1, 2013. Counts I-IV concern Defendant Kubiatowski. Count I alleges that AUSA Kubiatowski violated Villars's due process rights by detaining him longer than was necessary to secure his presence as a material witness at trial. Count II alleges that AUSA Kubiatowski violated Villars's due process rights by "adopting and implementing policies" that subjected Villars to "outrageous, excessive, cruel, inhuman, and degrading conditions of confinement." Count III alleges that Kubiatowski violated Villars's

equal protection rights by (as in Count I) detaining Villars longer than was "necessary to secure his appearance in court" and (as in Count II) "subjecting him to harsh[er] treatment" than other "similarly-situated material witness[es]," because of his race, ethnicity, or national origin. Count IV alleges that Kubiatowski violated his Fourth Amendment right to be free from unreasonable detention and failed to comply with the material witness statute (18 U.S.C. § 3144), the Bail Reform Act (18 U.S.C. § 3142(f)(2)), and Federal Rule of Criminal Procedure 46(h).

Counts V-XI concern the VRLB Defendants (the VRLB, VRLB police chief Gary Bitler, VRLB police officers Kenneth Coppes, Patrick Murray, and Michael Barr) and the Lake County Defendants (Lake County, Lake County sheriff Mark Curran, and Lake County jail deputies Scott Wilson and Dale Novarro). Count V alleges that the VRLB and Lake County Defendants violated Villars's Fourth Amendment rights by detaining him without probable cause of an immigration violation and "pursuant to an unauthorized and deficient detainer." Count VI alleges that the VRLB and Lake County Defendants violated Villars's Fourth Amendment rights because, Villars argues, Congress only authorized ICE to issue detainers in cases involving controlled substances. (Villars appears to argue that ICE improperly issued a detainer when it was unauthorized to do so.) Count VII alleges that the VRLB and Lake County Defendants violated Villars's Fourth Amendment rights by detaining him without a probable cause hearing. Count VIII alleges that the VRLB and Lake County Defendants violated Villars's Fourth Amendment rights by detaining him at the direction of the federal government in contravention of the Tenth Amendment. Count IX alleges that the VRLB and Lake County Defendants violated Villars's substantive due process rights by detaining him pursuant to a detainer that is not governed by "standards guiding [its] issuance." (Villars seems to argue that ICE detainers themselves are unconstitutional.) Count X alleges that the VRLB and Lake County Defendants

violated Villars's procedural due process rights by jailing him pursuant to the ICE detainer. And Count XI alleges that the VRLB and Lake County Defendants violated his procedural due process rights by detaining him pursuant to an ICE detainer that was not subject to judicial review. (Like in Count IX, Villars again seems to contest the constitutionality of ICE detainers generally.)

Count XII alleges a Fourth Amendment excessive force claim against VRLB officer Murray for bending Villars's finger during his arrest. (Officer Murray has not moved to dismiss this claim.)

Counts XIII and XIV alleges that Ozaukee County, Ozaukee County Sheriff Maury Straub, Ozaukee County Jail Administrator Jeffrey Sauder, and John Doe Jail Deputies 1-8 (collectively, "the Ozaukee County Defendants") violated his Fourth and Eighth Amendment rights by subjecting him to unreasonable strip searches and general mistreatment while housed at the Ozaukee County Jail. (The Ozaukee County Defendants have not moved to dismiss Plaintiff's SAC.)

Count XV alleges that the VRLB Defendants, Lake County Defendants, and AUSA Kubiatowski violated the Vienna Convention on Consular Relations by failing to inform Villars of his right to communicate with the Honduran consular.

Counts XVI and XVII allege that VRLB police officers Coppes, Murray, and Barr, and Lake County jail deputies Wilson and Novarro, conspired to deny Villars equal protection of the laws in contravention of 42 U.S.C. § 1985(2) and 42 U.S.C. § 1985(3), respectively. Count XVIII alleges that these same five Defendants violated 42 U.S.C. § 1986 by failing to prevent those violations of 42 U.S.C. § 1985.

Count XIX is a claim for *respondeat superior* in which Villars seeks to hold VRLB, Lake County, and Ozaukee County liable for the actions of their employees. Count XX is a claim against these same three entities for indemnification.

Count XXI alleges that Ozaukee County employees Straub and Sauder, as well as John Doe Deputies 1-8, deprived Villars of his constitutional right of access to the courts.

## II.    Motion to Dismiss Legal Standard

The purpose of a Rule 12(b)(6) motion to dismiss is not to decide the merits of the case; a Rule 12(b)(6) motion tests the sufficiency of the complaint. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). In reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Plaintiff's complaint and draws all reasonable inferences in his favor. *Killingsworth*, 507 F.3d at 618. To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in

original).  The Court reads the complaint and assesses its plausibility as a whole.  See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chi.*, 195 F.3d 950, 952 (7th Cir. 1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

## III.  Analysis

### A.  Claims Against the Village of Round Lake Beach Defendants

#### 1.  *Counts V-XI*

After stripping away duplicative allegations and arguments about the lawfulness of ICE detainers generally, Counts V-XI allege violations of three distinct constitutional rights against the VRLB Defendants stemming from their compliance with the ICE detainer: procedural due process, substantive due process, and those conferred by the Fourth Amendment.  According to Villars, the Round Lake Beach PD Incident/Offense Report" (attached to his SAC as exhibit C) demonstrates that the "booking process" at the VRLB police department ended at 9:27 p.m., and therefore, Villars argues, his confinement after that time was akin to being re-arrested and detained without probable cause of a new criminal violation.  SAC ¶ 80.  Reading the Incident/Offense Report in the light most favorable to Villars, however, the Court disagrees that a reasonable inference can be drawn that the "booking process" ended at 9:27 p.m.  The report very clearly states that Villars refused to provide a breath sample at 9:27 p.m., at which time he was served with "an immediate notice of summary suspension."  SAC Ex. C at 3.  The report then details several steps in the booking process that occurred *after* 9:27 p.m. (including photographing Villars's hand), and states that Villars was placed in a cell "to be held for sobriety" after the completion of the booking procedures.  *Id.*  The report was completed at 11:41

p.m. that evening, so it reasonably can be inferred that the booking process was completed sometime after 9:27 p.m. and before 11:41 p.m.

The VRLB Defendants argue that none of these timing issues matter because *County of Riverside v. McLaughlin* permits law enforcement to detain an arrestee for a minimum of 48 hours before a detainee's Fourth Amendment rights even arguably are violated. 500 U.S. 44 (2001). They argue that because Villars alleges that he was transferred to the custody of Lake County "at approximately 3am" (at most, seven hours after his arrest around 8 p.m.), Villars's detention by VRLB was presumptively reasonable. That's not quite true.

The forty-eight hour framework set forth in *County of Riverside* "governs the length of time which may elapse before a probable cause hearing" in cases involving extended detention. *Chortek v. City of Milwaukee*, 356 F.3d 740, 746 (7th Cir. 2004). Here, Villars was not awaiting a probable cause hearing. He posted the requisite $1,000 bond and was issued a "Personal Recognizance Bond" form sometime before midnight on October 10 (presumably at the completion of the booking procedures), which he signed to demonstrate his understanding that he was required to appear for a hearing at the Lake County Courthouse on November 8, 2011 at 8:30 a.m. in courtroom C-401. See SAC Ex. D. But for the ICE detainer, Villars argues, VRLB would have released Villars on his personal recognizance. Contrary to the VRLB Defendants' argument, *County of Riverside* did not grant law enforcement officials carte blanche to detain criminal suspects for forty-eight hours after their arrest. Rather, *County of Riverside* explicitly said that "unreasonable delays, even within the forty-eight hour period, may be constitutionally troublesome." *Chortek*, 356 F.3d at 746 (citing *County of Riverside*, 500 U.S. at 56). The Supreme Court specified: "Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the

arrested individual, or delay for delay's sake." *County of Riverside*, 500 U.S. at 56. In view of this language, the Seventh Circuit has said that holding a detainee after he has posted bond may be unconstitutional. See *Harper v. Sheriff of Cook Cnty.*, 581 F.3d 511, 515 (7th Cir. 2009). "[T]he constitutionality of this detention depends on whether the length of the delay between the time the [law enforcement agency] was notified that bond had been posted and the time that the detainee was released was reasonable in any given case." *Id.* "That is an individual issue that will depend on how long each detainee was held after bond was posted and what justifications there might be for the delay on that particular day and for that particular detainee . . . ." *Id.*

The VLRB Defendants argue that the ICE detainer provided a "legitimate reason" for detaining Villars after he posted bond. See VRLB Def. MTD [58] at 9; see also *id.* at 5 ("the movants had a valid DHS detainer requiring the Plaintiff to be held for 48 hours"). The Seventh Circuit has yet to address the issue, but a very recent Third Circuit case points out that every federal court of appeals that has considered the nature of ICE detainers characterizes them as "requests" that impose no mandatory obligation on the part of the detainer's recipient. *Galarza v. Szalczyk*, 2014 WL 815127, at *5 (3d Cir. Mar. 4, 2014). Agreeing with the First, Second, Fourth, Fifth, and Sixth Circuits, the Third Circuit emphasized that Congress did "not authorize federal officials to command state or local officials to detain suspected aliens subject to removal," that "all federal agencies and departments having an interest in the matter have consistently described such detainers as requests," and that to conclude otherwise would offend the Tenth Amendment, which prohibits the federal government from "command[ing] the government agencies of the states to imprison persons of interest to federal officials." *Id.* at *5-7.

Setting aside the fact that the detainer in Villars's case was not even addressed to the VRLB Defendants (but was instead, for some reason, addressed to the sheriff of Will County), the detainer self-identifies as a "request," a clarification that DHS added to the detainer form in 2010 when the agency also removed any mention of the word "require" from the form. See *Galarza*, 2014 WL 815127 at *7. The Third Circuit's well-reasoned opinion and the plain language of the detainer itself persuade the Court that the VRLB Defendants were not obligated to detain Villars pursuant to the ICE detainer.

In light of that conclusion and the Seventh Circuit's decision in *Harper*, it would be premature at this stage of the litigation – taking Plaintiff's allegations as true and without the benefit of a fully-developed record – for the Court to decide whether the VRLB Defendants had sufficient justification to detain Villars after he posted bond. Accordingly, the Court denies the VRLB Defendants' motion to dismiss Villars's allegations that they violated his Fourth Amendment and procedural and substantive due process rights.

However, the Court strikes four of these seven counts as duplicative and/or alleged as to the federal government (not the VRLB Defendants). Villars states three distinct constitutional claims based on his allegedly unlawful detention, so for clarity's sake, the Court collapses these allegations into just three counts – Count V alleging Fourth Amendment violations, Count IX alleging substantive due procession violations, and Count X alleging procedural due process violations. See *Titran v. Ackman*, 893 F.2d 145, 147 (7th Cir. 1990) ("Force during arrest must be reasonable within the meaning of the Fourth Amendment; between arrest and conviction the government may not 'punish' the suspect without due process of law; after conviction the government may not inflict cruel and unusual punishment."); see also *Armstrong v. Squadrito*, 152 F.3d 564, 582 (7th Cir. 1998) (acknowledging that prolonged detention implicates a

protected interest under substantive due process).  Accordingly, Counts VI, VII, VIII, and XI are dismissed as to the VRLB Defendants.

> 2.    *Count XV*

Count XV alleges that the VRLB Defendants violated Villars's constitutional rights by failing to notify him of his right to communicate with consular officials, as (Villars argues) required by Article 36(1)(b) of the Vienna Convention on Consular Relations.  The Seventh Circuit has held that there is a private right of action under 42 U.S.C. § 1983 grounded in violations of Article 36 of the Vienna Convention.  See *Jogi v. Voges*, 480 F.3d 822, 835-36 (7th Cir. 2007).  Article 36(1)(b) states:

> With a view to facilitating the exercise of consular functions relating to nationals of the sending State: . . . if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner.  Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay.  The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph.

Vienna Convention, Art. 36.  The Seventh Circuit, quoting former Secretary of State William P. Rogers, has been clear that Article 36 "requires that authorities of the receiving State inform the person detained of his right to have the fact of his detention reported to the consular posted concerned and of his right to have the fact of his detention reported to the consular post concerned and of his right to communicate with that consular post."  *Jogi*, 480 F.3d at 830.

Despite *Jogi* and the plain language of Article 36, the VRLB Defendants contend that there is no "legal support" for Villars's allegation that the Defendants were required to notify him of his rights under the Vienna Convention during the seven hours that he was in their custody.  They direct the Court to 8 CFR 236.1(e), which the VRLB Defendants argue

demonstrates that they, at most, were required to notify Villars of his Article 36 rights within 72 hours of detention.  8 CFR 236.1(e) reads: "Every detained alien shall be notified that he or she may communicate with the consular or diplomatic officers of the country of his or her nationality of the United States.  Existing treaties with the following countries require immediate communication with appropriate consular or diplomatic officers whenever nationals of the following countries are detained in removal proceedings."  A footnote clarifies that "U.S. authorities shall notify responsible representative within 72 hours of the arrest or detention of one of their nationals."  Honduras, as Defendants admit, is not one of the countries to which this section of the CFR pertains, but more importantly, this section speaks to the immediacy with which U.S. authorities must communicate with an arrestee's consular, *not* to the immediacy with which U.S. authorities must inform the arrestee of his individual rights pursuant to Article 36 of the Vienna Convention.  Article 36 explicitly states that authorities must inform the arrestee of those rights "without delay."

Although neither the Seventh Circuit nor the Supreme Court have defined the phrase "without delay" in terms of a specific timeline, the U.S. Department of State instructs all federal, state, and local law enforcement agencies that "without delay" means "promptly."  U.S. Dep't of State, Consular Notification and Access, 21 (Fourth ed, March 2014) (the State Department's "instructions for federal, state, and local law enforcement and other officials regarding foreign nationals in the United States and the rights of consular officials to assist them").  More specifically, the State Department instructs that "[o]rdinarily, [law enforcement] must inform a foreign national of the possibility of consular notification by or at the time the foreign national is booked for detention, which is at a time when identity and foreign nationality can be confirmed in a safe and orderly way.  If the identity and foreign nationality of a person are confirmed

during a custodial interrogation that precedes booking, consular information should be provided at that time." *Id.*

Here, accepting Villars's allegations as true, his consular rights clearly were violated. VRLB officers knew that he was a foreign national when they confiscated his documentation. Yet rather than informing him of his right of consul contact at that time, or even at the completion of the booking process, Defendants detained him for several more hours until transferring him into the custody of a completely separate law enforcement agency, without ever notifying him of his clearly established Article 36 rights (and without any confidence that he would ever be told of these rights). For this reason, the VRLB Defendants' motion to dismiss Count XV is denied and their claim of qualified immunity is rejected at this time. See *Estate of Escobedo v. Bender*, 600 F.3d 770, 779 (7th Cir. 2010) (noting that a constitutional right is clearly established, and thus qualified immunity is unavailable, when its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right").

### 3. Counts XVI-XVIII

The VRLB Defendants argue that Plaintiff's SAC does not state legally cognizable claims that Defendants Coppes, Murray, and Barr conspired to deny Villars equal protection of the law in violation of 42 § U.S.C. 1985(2), 42 § U.S.C. 1985(3), and 42 § U.S.C. 1986. Specifically, they argue that Villars does not allege that he is a member of a protected class or that they conspired (*i.e.,* agreed) to deprive him of any constitutional rights. The Court disagrees. To state a claim for Section 1985 conspiracy, a plaintiff must allege: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws;

and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Roach v. City of* Evansville, 111 F.3d 544, 547 (7th Cir. 1997).

Villars specifically alleges that the VRLB Defendants violated his rights because of their "animus against Latino minorities." SAC ¶ 309. In support, Villars avers that during his arrest (even before he was searched and his documents were confiscated) and detention, officers called him a "fucking Mexican" and a variety of other racial slurs. SAC ¶¶ 33-34. Later, Defendant Coppes told Villars that he was "going to be in Mexico by the time [Coppes] finish[ed] with [him]." SAC ¶ 41. Villars alleges that even after he explained to the officers that he was, in fact, Honduran, Defendants Coppes, Barr, and Murray wrote "Mexico, Mexico" as his place of birth on the "Incident/Offense Report." See SAC Ex. C at p. 1. These allegations support Villars's contention that the VRLB Defendants conspired to deprive him of his constitutional rights, and that they did so because of his race. "To establish a prima facie case of civil conspiracy under Section 1985, a plaintiff must show express or implied agreement among the defendants to deprive the plaintiff of his constitutional rights, and a deprivation of those rights in the form of overt acts in furtherance of the agreement." *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988). Taking all the facts in the light most favorable to Villars and drawing all reasonable inferences in his favor, Villars has stated a claim that the officers, at least implicitly, both agreed to deprive him of his rights and then did so.

The VRLB Defendants also argue that the statute of limitations precludes Villars from pursuing a claim based on 42 § U.S.C. 1986 for their alleged failure to prevent 42 § U.S.C. 1985 violations. 42 § U.S.C. 1986 states that "no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action accrued."

Defendants argue that because their interactions with Villars ended on October 10, 2010 and Villars did not include his Section 1986 claim until he filed his Second Amended Complaint on August 13, 2013, the one-year statute of limitations bars his claim. The statute of limitations issue, however, is not quite as straight-forward as Defendants' one-paragraph argument for dismissal would suggest. "Ordinarily, a civil rights claim accrues at the time a person becomes or should have become aware that [he] was injured, that is when [he] knows or should have known [his] constitutional rights have been violated." *Anderson v. Cornejo*, 199 F.R.D. 228, 250 (N.D. Ill. 2000) (citing *Wilson v. Giesen*, 956 F.2d 738, 740 (7th Cir. 1992)). Particularly in the context of a Section 1986 claim, which implicates not only the date on which Plaintiff knew that his civil rights were violated but also the date on which a Defendant could have prevented that violation, this is a difficult determination for the Court to make on a motion to dismiss. At this juncture, the Court has no information as to when Villars learned that his rights were violated (recall that no one ever informed him during his detention of his consular rights, for example). Moreover, Villars commenced this suit on June 6, 2012, and his Section 1986 claim may relate back to this date. For these reasons, the Court, like other judges in this district who have confronted this issue in the Section 1986 context, determines that it would be imprudent to rule on Defendants' statute of limitations argument at this stage of this case. See *id.* ("Plaintiffs need not plead in the complaint that they lacked knowledge and it cannot be resolved on the motion to dismiss whether plaintiffs actually were or should have been aware of defendants' knowledge of the alleged Section 1985 conspiracy more than a year before the filing of the Section 1986 claims.").

4. *Count XIX (Respondeat Superior) and Claims Against Defendant Bitler*

The VRLB Defendants argue that Plaintiff's *respondeat superior* claim against the Village of Round Lake Beach, as well as all of his claims against VRLB police chief Bitler, should be dismissed because "a municipality cannot be held liable under Section 1983 on a *respondeat superior* theory." *Monell v. New York Dep't of Soc. Servs*, 438 U.S. 658, 691 (1978); see also *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (noting that municipalities are only responsible for their policies and not the misconduct of their employees). Although the VRLB Defendants are correct that "no *Monell* claim is mentioned or asserted in the counts directed towards the VRLB," they concede that Villars's SAC does allege that the policies and practices of the VRLB caused the constitutional violations of which he complains. Villars alleges that "[i]t is a policy or custom of RLBPD to detain persons with Hispanic backgrounds who are named on immigration detainers," that "[i]t is a policy or custom of RLBPD to detain persons named in immigration detainers for longer periods of time than permitted by the United States Constitution," and that the VRLB has a "policy of honoring all ICE detainers." SAC ¶¶ 59, 77-78.

Plaintiff's opposition brief suggests that he intended to assert a *Monell* claim in his SAC. [66] at 16 ("Defendants do not dispute that the VRLB can be held liable under [*Monell*] for causing Plaintiffs' [sic] deprivation of constitutional rights . . . Plaintiff have [sic] alleged a number of ongoing policies, custom and practices adopted and acquiesced by VRLB and Chief Bitler as the policy-maker for the VRLB from which Plaintiffs' [sic] claims arise."). "It is well-settled law that *pro se* complaints are to be liberally construed and not held to the stringent standards expected of pleadings drafted by lawyers." *McCormick v. City of Chicago*, 230 F.3d 319, 325 (7th Cir. 2000). And the VRLB Defendants effectively admit that Plaintiff's SAC

provided them notice of these claims. For these reasons, the Court will construe Count XIX as a *Monell* claim, rather than a *respondeat superior* claim, and Defendants' motion to dismiss is denied as to Count XIX.

The Court agrees with Defendants, though, that Defendant Bitler should be dismissed from the case. No substantive allegation is lodged against Defendant Bitler and the SAC makes clear that Bitler is named only because Villars considers him, as police chief, to be the "final policy maker" of the VRLB police department. See SAC ¶ 23. In the absence of *respondeat superior* liability, a supervisor only can be held personally liable if he knows of a subordinate's conduct, and either facilitates, condones, or approves it. See *Backes v. Village of Peoria Heights, IL*, 662 F.3d 866, 869-70 (7th Cir. 2011). And suits against an individual in his official capacity "is simply a suit against the municipality." *Smith v. Blakely*, 124 F.3d 205, at *3 (7th Cir. 1997). Therefore, Defendant Bitler is not a proper Defendant in this case.

**B.    Claims Against the Lake County Defendants**

*1.    Counts V-XI*

The Lake County Defendants make the exact same arguments for the dismissal of Villars's Fourth Amendment and due process claims made by the VRLB Defendants – namely, that the ICE detainer justified their detention of Villars. Lake County received the ICE detainer on October 11, 2010 at 1:01 a.m., roughly three hours prior to Villars's transfer into their custody. SAC ¶¶ 82, 90. Lake County Jail detained Villars until October 12, 2010 at 8:04 a.m., for approximately 29 hours total. SAC Ex. G. The Lake County Defendants argue that 8 CFR 287.7(d) authorizes a law enforcement agency to detain an individual "for up to 48 hours after local custody over the detainee would otherwise end." [60] at 3. The cited federal regulation, titled "Temporary detention at Department request," reads: "Upon a determination by the

Department to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department." 8 CFR § 287.7(d).  In their words, "[t]he viability of Villars' cause of action against the Lake County Defendants is reduced to simple math.  Since his stay at the Lake County Jail ended within 48 hours of the issuance of the detainer, he cannot state a cause of action against the Lake County Defendants."  [74] at 3.  The Court disagrees.

First, the plain language of this regulation does not support Defendants' reading.  The regulation instructs that the custody of an alien is *not to exceed* 48 hours; nowhere does it authorize the detention of an alien for 48 hours *after local custody over the detainee would otherwise end*.  Second, and more fundamentally, even if Defendants' interpretation of this regulation was correct, this language does not alter or amend the contours of the Fourth or Fourteenth Amendments of the United States Constitution.  As the Third Circuit noted:

> The words 'shall maintain custody' in the context of the regulation as a whole, appear next to the use of the word 'request' throughout the regulation.  Given that the title of Section 287.7(d) is 'Temporary detention at Department request' and that Section 287.7(a) generally defines a detainer as a 'request,' it is hard to read the use of the word "shall" in the timing section to change the nature of the entire regulation.  However, even if we credit that the use of the word 'shall' raises some ambiguity as to whether detainers impose mandatory obligations, this ambiguity is clarified on numerous fronts.

*Galarza*, 2014 WL 815127 at * 4.  First, no federal courts of appeals has ever described an ICE detainer as anything but a request.  Second, Congress did not authorize DHS to command the detention of aliens.  Third, all relevant federal agencies and departments consider ICE detainers to be requests.  *Id.*

The Court agrees with the Lake County Defendants that "jail officials can detain an individual after bond has been posted if they have a legitimate reason for the length of

detention." [60] at 6 (citing *Harper*, 581 F.3d at 514-15). But the Court disagrees, at least at this stage of the litigation, that DHS's request that Defendants detain Villars (without probable cause that Villars committed a violation of immigration laws) so clearly constituted a legitimate (constitutional) reason as to render Plaintiff's claims meritless. Defendants cite to *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451 (4th Cir. 2013), for the general proposition that "local authorities may hold a person pursuant to a detainer." [60] at 4. But what *Santos* actually says is that "the Supreme Court has not resolved whether local police officers may detain or arrest an individual for suspected *criminal* violations, [but] the Court has said that local officers generally lack authority to arrest individuals suspected of *civil* immigration violations. 725 F.3d at 464 (emphases in original). Specifically, "the Supreme Court has held unconstitutional a provision in an Arizona statute that authorized a state officer to "'without a warrant . . . arrest a person if the officer has probable cause to believe . . . [the person] has committed a public offense that makes [him] removable from the United States." *Id.* (quoting *Arizona v. United States*, 132 S. Ct. 2492, 2505 (2012)). But *Santos* noted that, after *Arizona*, there is an open question as to whether "state and local law enforcement officers . . . may be able to investigate, detain, and arrest individuals for *criminal* violations of federal immigration law." *Id.* Here, Villars alleges (and the face of the ICE detainer does not refute) that Lake County lacked probable cause that Villars violated federal criminal law, and instead detained him while the federal government investigated to determine whether or not he had. Taking that as true for the purpose of Defendants' motion to dismiss, the Court concludes that Villars has stated cognizable claims in Counts V-XI.

As with the VRLB Defendants, the Court consolidates Plaintiff's duplicative allegations and/or those lodged against the federal government into three distinct counts: Count V alleging

Fourth Amendment violations, Count IX alleging substantive due process violations, and Count X alleging procedural due process violations. For the sake of clarity and judicial efficiency, Counts VI, VII, VIII, and XI are dismissed.

### 2. Count XV

The Lake County Defendants, like the VRLB Defendants, argue that Villars's Vienna Convention claim should be dismissed due to a "lack of legal support" for the contention that they were required to inform Villars of his consular rights within the time period in which they detained him and that they are entitled to qualified immunity. For the same reasons the Court denied the VRLB Defendants' motion to dismiss these counts, as discussed earlier, the Court denies the Lake County Defendants' motion, as well.

### 3. Count XVI-XVIII

The Lake County Defendants' one-paragraph argument for the dismissal of Plaintiff's Section 1985 conspiracy claims against Defendants Wilson and Novarro misses the mark. They argue that "Plaintiff alleges no facts that plausibly suggest any kind of agreement between the Lake County Defendants and *other defendants*." [60] at 8 (emphasis added). But Section 1985 only requires an agreement between "two or more persons"; nowhere does the statute specify that these persons must be from separate and distinct law enforcement agencies. See 42 § U.S.C. 1985(2), (3). An allegation that two of the Lake County Defendants agreed (even implicitly) to deprive Villars of his rights is well-pled. Here, Villars's alleges that the Lake County Defendants acted together in detaining Villars after he posted bond, without probable cause, and without informing him of his consular rights. Inherent in his allegations, making all reasonable inferences in Plaintiff's favor, is that the Lake County Defendants at least implicitly agreed

among themselves to do so.  Accordingly, their motion to dismiss is denied with respect to Counts XVI-XVIII.

4.      *Counts XIX and XX*

The Lake County Defendants argue that, to the extent that Plaintiff alleges a *Monell* claim in Count XIX (titled *respondeat superior*), the Court still should deny that count.  They argue that "Plaintiff does not allege that the Sheriff had an explicit unconstitutional policy" and that his *Monell* allegations "contain boilerplate language only."  [60] at 9.  Defendants overlook paragraphs 107-112 of Villars's SAC, where he alleges, among other things, that "[Lake County has] a pattern and practice, custom, and policy of continuing the detention of County prisoners after the conclusion of their state criminal custody solely on the basis of DHS issuance of an immigration detainer.  Upon information and belief, Latino prisoners are continued in County custody after bail bond and the conclusion of their criminal sentence solely on the basis of DHS issuance of an immigration detainer.  Persons subject to an ICE detainer in Lake County are typically confined for 1-5 days each before ICE eventually takes physical and legal custody of the individual."  SAC ¶¶ 107-109.  For the same reasons articulated above regarding the VRLB Defendants' motion, Villars's allegations state a *Monell* claim against the Lake County Defendants and their motion to dismiss with respect to Counts XIX and XX is denied.

**C.      Claims Against AUSA Kubiatowski**

Defendant Kubiatowski argues that Villars may not sue him in his official capacity and that absolute prosecutorial immunity shields him in his individual capacity from Villars's suit.  The Court agrees with Kubiatowski that Villars's claims against him in his official capacity are tantamount to constitutional tort claims against the federal government itself, (see *Guzman v. Sheahan*, 495 F.3d 852, 859 (7th Cir. 2007)), which the Supreme Court did not authorize in

*Bivens v. Six Unknown Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). *Bivens* only authorized such claims against federal officers in their individual capacities. *F.D.I.C. v. Meyer*, 510 U.S. 471, 485 (1985) ("[W]e implied a cause of action against federal officials in *Bivens because* a direct action against the Government was not available . . . the purpose of *Bivens* is to deter *the officer*") (emphasis in original). Therefore, all five claims against Kubiatowski in his official capacity are dismissed.

With respect to Villars's claims against him in his individual capacity, Kubiatowski argues that absolute immunity cloaks his pursuit of a material witness warrant for Villars. Absolute immunity extends to activities of a prosecutor that are "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). Prosecutorial immunity "extends beyond an individual prosecutor's decision to indict or try a case." *Fields v. Wharrie*, 672 F.3d 505, 510 (7th Cir. 2012) (citing *Van de Kamp v. Goldstein*, 555 U.S. 335, 344-48 (2009)). It protects the "functioning of the public office, and thus, encompasses any action directly relevant to a prosecutor's ability to conduct a trial." *Id.* Therefore, "acts taken in preparing for the initiation of judicial proceedings or for trial" are entitled to absolute immunity. *Davis v. Zirkelbach*, 149 F.3d 614, 617 (7th Cir. 1998). However, when a prosecutor "'functions as an administrator rather than as an officer of the court,' he is entitled only to qualified immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) (quoting *Imbler*, 424 U.S. at 431 n. 33.).

The Seventh Circuit and, much more recently, the Third and Sixth Circuits, have held that a prosecutor's actions related to securing a material witness warrant fall within the scope of absolute immunity. See *Daniels v. Kieser*, 586 F.2d 64 (7th Cir. 1978); *Adams v. Hanson*, 656 F.3d 397, 403 (6th Cir. 2011); *Odd v. Malone*, 538 F.3d 202, 212 (3d Cir. 2008). The Seventh

Circuit tackled the issue more than 35 years ago in a case where a witness accused a federal prosecutor of violating his constitutional rights by lying to the court to have him detained as a material witness. *Daniels*, 586 F.2d at 66. But because the prosecutor, by securing the presence of a witness for trial, was attempting to prove all of the elements of the government's case, the Seventh Circuit concluded that the prosecutor's actions before the court (*i.e.,* his decision to pursue a material witness warrant and any representations made to the Court to secure it) were intimately associated with the judicial phase of the criminal process. *Id.* at 68. Therefore, to the extent that Villars seeks to hold Kubiatowski liable for misrepresentations that Kubiatowski allegedly made to Judges Castillo and/or Denlow to secure Villars's detention, Kubiatowski is absolutely immune.

However, Villars also alleges that Kubiatowski violated his Fourth Amendment and due process rights, along with the federal material witness statute and Federal Rule of Criminal Procedure 46(h), by failing to keep the court apprised of Villars's continued detention, causing him to remain in jail for almost two months – from November 15, 2010 until January 11, 2011 – without a bail hearing. SAC ¶¶191-92. The federal material witness statute (18 U.S.C. § 3144) requires that detainees be treated in accordance with 18 U.S.C. § 3142, which requires an immediate detention hearing. See 18 U.S.C. § 3144(f) ("The hearing shall be held immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance. Except for good cause, a continuance on motion of such person may not exceed five days . . . and a continuance on a motion of the attorney for the Government may not exceed three days."). Here, Villars contends that he never had his detention hearing. From the docket, it appears that Villars made his first appearance before Judge Denlow on November 15, 2010, at which time his detention hearing was scheduled for

November 19. When Villars was diagnosed with tuberculosis, his detention hearing was postponed indefinitely and Villars did not appear in Court again until January 13, at which time a detention hearing was scheduled for January 27. On January 27, by agreement of the parties, Villars was released from custody. Federal Rule of Criminal Procedure 46(h)(2) requires an attorney for the government "to report biweekly to the court, listing each material witness held in custody for more than 10 days pending indictment, arraignment, or trial. For each material witness listed in the report, an attorney for the government must state why the witness should not be released with or without a deposition being taken under Rule 15(a)." Villars contends that Kubiatowski ignored this Rule and, as a result, the Court forgot about him after his November 19 detention hearing was continued. Villars alleges that, as a consequence of Kubiatowski's inaction, he sat in jail for over two months until a detention hearing finally was scheduled, at which time he was ordered released.

The Seventh Circuit did not have occasion in *Daniels* to address whether immunity shields a prosecutor from the sorts of allegations made by Villars, nor has the court of appeals addressed the issue of a prosecutor's immunity in the material witness context since then. The Third Circuit, however, recently ruled on an analogous set of allegations. In *Odd v. Malone*, a detainee brought suit for constitutional violations against a prosecutor who obtained a material witness warrant, but then failed to notify the Court that the trial for which the witness was being detained had been continued. 538 F.3d at 213. The Third Circuit, following *Daniels*, held that, although the prosecutor was acting in her prosecutorial capacity when she secured the material witness warrant (and thus was entitled to absolute immunity), the state's attorney's failure to inform the Court that the detainee remained incarcerated – akin to a failure by a federal prosecutor to make report a list of material witness detainees to the Court in accordance with

Rule 46(h), the Third Circuit said – was primarily administrative, because it required no advocacy on the part of the prosecutor. *Id.* As to this administrative oversight, the Court held, the prosecutor was not entitled to absolute immunity. *Id.* The Court finds the Third Circuit's reasoning persuasive, and notes, as the Third Circuit did, that it is the prosecutor's burden to show that he was functioning as the state's advocate when performing the action in question. Taking Villars's allegations as true, as the Court must, Kubiatowski has not done that at this stage of the litigation.

Accordingly, Kubiatowski's motion to dismiss Counts I-IV is denied.

## IV. Plaintiff's Motion for Certification to Receive U-VISA Certification

In addition to his briefs in opposition to Defendants' motions to dismiss, Villars has filed a motion requesting that the Court certify his application for a U-Visa [79] pursuant to 8 C.F.R. § 214.14(c)(2)(i) and 8 U.S.C. § 1101(a)(15)(U)(i)(III) on account of death threats that Villars says that he has received due to his work as a confidential informant for the FBI. The Government opposes the motion. Villars and the Government agree that Congress created the framework for what have become known as U-Visas as part of the Battered Immigrant Women Protection Act of 2000 and that the purpose of the U-Visa classification was to strengthen "the ability of law enforcement to investigate and prosecute cases of domestic violence, sexual assault, human trafficking and related crimes affecting immigrant communities while offering protection to alien crime victims in keeping with the humanitarian interests of the United States." [91] at 4. The parties also agree that in order to qualify for a U-Visa, an alien must prove that (1) he suffered substantial physical or mental abuse resulting from "qualifying criminal activity," (2) he possesses knowledge about that crime, (3) he has been helpful, is being helpful, or is likely to be helpful to a certifying agency in the investigation or prosecution of that crime, and (4) that crime

suffered by the alien violated United States laws or occurred in the United States. See 8 C.F.R. § 214.14(b); 8 U.S.C. § 1101(a)(15)(U)(i).

The U.S. Citizenship and Immigration Services ("USCIS") grants or denies U-Visa petitions, and federal judges may "certify" an applicant's petition to USCIS, attesting that the alien has, in fact, been helpful in an investigation or prosecution. See 8 C.F.R. § 214.14(a)(3)(ii). However, the certifying person must be able to attest that (1) he is a federal, state, or local law enforcement officer, prosecutor, or judge; (2) he is responsible for the "detection, investigation, prosecution, conviction, or sentencing of qualifying criminal activity;" (3) the applicant has been a victim of qualifying  criminal activity for which the certifying agency is responsible for the investigation, prosecution, conviction, or sentencing; (4) the applicant possesses information concerning such qualifying criminal activity; (5) the application has been, is being, or is likely to be helpful to an investigation or prosecution of that qualifying criminal activity; and (6) the qualifying criminal activity violated U.S. law or occurred within the United States. 8 C.F.R. § 214.14(c)(2)(i).

The regulation, therefore, does not authorize the undersigned judge to act as a certifying official for Villars, for at least the reason that he has never presided over a criminal case in which Villars was involved.  But even assuming that the undersigned judge could act as a certifying official here, Villars's request suffers from a more fundamental problem: the criminal case in which Villars acted as a confidential informant over which Judge Castillo presided (*U.S. v. Diaz*, 10-cr-0199) did not involve "qualifying criminal activity."  8 C.F.R. § 214.14(a)(9) makes clear that "qualifying criminal activity" only includes "Rape; torture; trafficking; incest; domestic violence; sexual assault; abusive sexual contact; prostitution; sexual exploitation; female genital mutilation; being held hostage; peonage; involuntary servitude; slave trade; kidnapping;

abduction; unlawful criminal restraint; false imprisonment; blackmail; extortion; manslaughter; murder; felonious assault; witness tampering; obstruction of justice; perjury; or attempt, conspiracy, or solicitation to commit any of the above mentioned crimes." *U.S. v. Diaz* was a drug trafficking case that involved none of the above.

Moreover, U-Visas provide relief to *victims* of qualifying crimes, not to witnesses. To get around this, Villars claims to have been a victim of death threats (which he characterizes as witness tampering and obstruction of justice) and false imprisonment by the Defendants in this civil case. But, as the Government notes and Villars does not attempt to refute, there is not currently an investigation or a prosecution into the makers of those threats or into any of the Defendants in this civil case for the alleged conduct at issue here. Therefore, even if Villars suffered abuse as a victim of these alleged crimes, he is still ineligible for a U-Visa. See 8 C.F.R. § 214.14(b); 8 U.S.C. § 1101(a)(15)(U)(i).

## IV. Conclusion

For the reasons stated above, the Court grants the VRLB Defendants' motion to dismiss [58] only as it pertains to Gary Bitler. Defendant Bitler is dismissed from the case. The Court denies the VRLB Defendants' motion [58] in all other respects. However, on its own motion the Court dismisses Counts VI, VII, VIII, and XI as duplicative for the sake of judicial efficiency and clarity as this litigation moves forward. Likewise, the Court denies the Lake County Defendants' motion [60], but dismisses Counts VI, VII, VIII, and XI for the same reasons. Finally, the Court grants Defendant Kubiatowski's motion [83] to the extent that Plaintiff is suing him in his official capacity; however, the Court denies Kubiatowski's motion [83] as it concerns Plaintiff's claims against him in his personal capacity.

For the reasons stated above, Plaintiffs' motion for certification to receive U-Visa certification [79] also is denied. This case is set for further status on May 20, 2014 at 9:00 a.m.

Dated: May 5, 2014

_____
Robert M. Dow, Jr.
United States District Judge