**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JULIO VILLARS,              ) | |
|                       ) | |
|       Plaintiff,     ) | |
|                       ) | |
|    v.                ) | |
|                       ) | Case No. 12-cv-4586 |
| STEPHEN KUBIATOWSKI,   ) | |
| OZAUKEE COUNTY, MAURY   ) | |
| STRAUB, JEFFREY SAUER, SCOTT   ) | Judge Robert M. Dow, Jr. |
| SMITH, ERIC SAGER, STAN   ) | |
| GRIFFIN, BRAD KITTINGER,   ) | |
| CHARLES FRECHETTE, RICHARD   ) | |
| SEIDEMANN, BRIAN MCINNIS, and   ) | |
| CORY JEPSON,   ) | |
|                       ) | |
|       Defendants.   ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In his governing Sixth Amended Complaint ("Complaint," [175]), Plaintiff Julio Villars ("Plaintiff") brings *Bivens* claims against Stephen Kubiatowski ("Kubiatowski") for alleged violations of the Fourth Amendment (Count I) and Fifth Amendment (Count II) based on Kubiatowski's failure to comply with Federal Rule of Criminal Procedure 46(h)(2). Plaintiff also brings Section 1983 claims against Ozaukee County, Maury Straub, Jeffrey Sauer, Scott Smith, Eric Sager, Stan Griffin, Brad Kittinger, Charles Frechette, Richard Seidemann, Brian McInnis, and Cory Jepson (collectively, the "Ozaukee County Defendants") for allegedly violating the Fourth Amendment by subjecting him to unreasonable strip searches (Count VI); the First and Fourteenth Amendments by denying him access to the courts (Count VII); and the Eighth and Fourteenth Amendments for arbitrarily incarcerating him for 84 days, humiliating, harassing and mistreating him, and cuffing, chaining, shackling, and strip searching him without reasonable suspicion (Count VIII). Currently before the Court are the Ozaukee County Defendants' motion

for summary judgment [231] and Kubiatowski's motion for summary judgment [235]. For the

reasons explained below, the Court grants both the Ozaukee County Defendants' motion for

summary judgment [231] and Kubiatowski's motion for summary judgment [235]. Judgment will

be entered in favor of Defendants and against Plaintiff. Because this ruling resolves all remaining

claims in the case, this civil case will be terminated.[1]

## I.    Background

The following facts are taken from the parties' Local Rule 56.1 statements, [233], [237],

[239], [243], [245], and [248], and are undisputed except where a dispute is noted.[2] In a number

of instances—which the Court notes specifically below—Plaintiff fails to support his factual

allegations and his denials of Defendants' factual allegations with admissible record evidence, as

required by Local Rule 56.1. In general, the Court will disregard such allegations and denials. See

*Aberman v. Board of Education of City of Chicago*, 242 F. Supp. 3d 672, 676-77 (N.D. Ill. 2017)

(outlining the requirements of Local Rule 56.1 and the consequences of failing to comply with the

rule).

Plaintiff is a Honduran national who served as a cooperating source for the FBI during the

investigation of Jose Diaz ("Diaz") and Alberto Negron ("Negron"). Acting under the direction

and supervision of the FBI and/or DEA,[3] Plaintiff posed as a buyer for one pound of

---

[1] All other defendants and claims in the case have already been dismissed. See [205] (dismissing defendants Pasqual, Lee, Roecker, Bella, FBI, DEA, USAO, DOJ, and the United States pursuant to Rule 12(b)(6)); [123] dismissing defendants Village of Round Lake Beach, Coppes, Murray, Barr, and Bitler pursuant to joint stipulation).

[2] The Court has combined the facts provided by the two sets of Defendants in the interest of efficiency. In its review of the Defendants' Local Rule 56.1 statements, the Court did not note any inconsistencies or conflicts. In general, the facts concerning Kubiatowski are taken primarily from his Local Rule 56.1 statements and Plaintiff's response, while facts concerning the Ozaukee County Defendants are taken primarily from their Local Rule 56.1 statements and Plaintiff's response.

[3] Plaintiff asserts in his Local Rule 56.1 statement that he was also under the supervision of the United States Attorney's Office for the Northern District of Illinois. However, Plaintiff does not cite any

methamphetamine. Plaintiff negotiated the transaction through Diaz. That transaction led to the criminal charges brought in *United States v. Jose Diaz, et al*., No. 10 CR 199 ("*Diaz*"). Kubiatowski was one of the Assistant United States Attorneys ("AUSAs") assigned to prosecute *Diaz*. Diaz and Negron were indicted by a federal grand jury sitting in the Northern District of Illinois on April 7, 2010. The indictment alleged that, between February 25, 2010, and March 11, 2010, Diaz, Negron, and others conspired to knowingly and intentionally possess with intent to distribute and to distribute 50 grams or more of mixtures containing methamphetamine in violation of 21 U.S.C. § 846. Diaz and Negron were arraigned on April 14, 2010. Both pleaded not guilty at arraignment.

Kubiatowski was advised by the FBI that Plaintiff, who was in the country illegally, had been determined to be deportable by Immigrations and Customs Enforcement ("ICE"). The FBI had reached an agreement with ICE to permit Plaintiff to remain in the United States in "Deferred Action" status while he was acting as a cooperating source, provided that Plaintiff did not commit any offenses.[4]

On October 10, 2010, Plaintiff was arrested by Round Lake Beach police for driving under the influence. He was transferred to ICE custody and detained in Dodge County, Wisconsin in October and November 2010. ICE notified the FBI that, because this was Plaintiff's second DUI

---

"affidavits, parts of the record, [or] other supporting materials" to support his assertion, as required by Local Rule 56.1(b)(3)(B). Therefore, the Court will not consider it. See *Aberman*, 242 F. Supp. 3d at 676-77.

[4] In response to this paragraph of Kubiatowski's Local Rule 56.1 statement, Plaintiff states, "[u]ndisputed to the extent that [Plaintiff] was promised a non-deportation agreement which was broken by the government." [243] at 3. Plaintiff's response does not create a factual dispute because it is not supported by an affidavit or any other record evidence. See Local Rule 56.1(b)(3)(B).

offense, ICE would have to deport him within the next 90 days.[5]  Following his arrest, Plaintiff

called FBI Special Agent Roecker ("Roecker") to obtain assistance in regaining his previous

deferred action status.  Roecker advised Plaintiff that ICE was unwilling to grant deferred action

status to Plaintiff due to his second arrest.

Shortly before October 27, 2010, the FBI advised the prosecution team in the *Diaz* case

that Plaintiff was being held by ICE at the Dodge County Detention Facility in Juneau, Wisconsin,

pending imminent deportation proceedings.  At the time that Kubiatowski learned that Plaintiff

was facing possible deportation, a trial date had not yet been set in *Diaz*.  After consultation with

his supervisory chain, Kubiatowski filed an application for a material witness warrant on October

27, 2010, to secure and preserve Plaintiff's presence in the United States should he be needed for

testimony.  Judge Castillo granted the material witness motion on November 3, 2010, and directed

the clerk to issue a warrant to bring Plaintiff to the court as a material witness.

Plaintiff was taken into custody by the U.S. Marshals Service.  Pursuant to a contract

between the Marshals Service and the Ozaukee County Sheriff's Department relating to the

housing of federal prisoners, the Marshals Service transferred Plaintiff to the Ozaukee County Jail

("Jail") for detention.  The Jail is located in Port Washington, Wisconsin.  At the time of Plaintiff's

detention, Defendant Maury Straub ("Straub") was the Ozaukee County Sheriff and head of the

Ozaukee County Sheriff's Department, which includes the Jail.  Defendant Jeffrey Sauer ("Sauer")

was Captain of the Ozaukee County Sheriff's Department and the head of Jail Administration and

Court Services.  Defendants Scott Smith ("Smith"), Eric Sager ("Sager"), Stan Griffin ("Griffin"),

---

[5] Plaintiff does not dispute this, except to the extent that he asserts that he was "illegally detained after
posting bond."  [243] at 3.  Plaintiff's response is not supported by any citation to the record and does not
create a material factual dispute.  See Local Rule 56.1(b)(3)(B).

Brad Kittinger ("Kittinger"), Charles Frechette ("Frechette"), Richard Seidemann ("Seidemann"), Brian McInnis ("McInnis"), and Cory Jepson ("Jepson") were Deputies at the Jail.

Plaintiff was booked into the Jail on November 10, 2010. His detention was placed on a hold set by the United States Marshals Service from Chicago as a "boarder," "safekeeper," and "Federal – Material Witness." [239] at 3-4. When Plaintiff entered the Jail, he underwent a visual strip search. Plaintiff was not informed of the purpose of the strip search prior to being searched. Plaintiff was patted down outside of his clothing prior to the strip search. At no point was Plaintiff probed or touched by anyone while the visual strip search took place. Under its strip search policy, the Jail, in order to maintain an orderly facility, does not distinguish between the types of detainees held in its general population at the facility. To ensure a safe, secure, and hygienic environment, the Jail maintains a policy of conducting a visual strip search of every individual that is entering the custody of the Jail or has left the custody of its officers and is returning from being held or housed by another entity.

While in detention at the Jail, Plaintiff had the ability to mail letters. He was not required to pay to mail letters. During his detention, Plaintiff sent letters to the District Court for the Northern District of Illinois, the United States Attorney's Office, and the Federal Defender's Office. Specifically, Plaintiff sent legal correspondence to Judge Castillo at the U.S. Federal Court on December 31, 2010; the Federal Defender Program/United States District Court in Chicago on January 4, 2011; a general address of 219 South Dearborn Street in Chicago on January 4, 2011; and Kubiatowski on January 26, 2011. During his detention, Plaintiff also had access to a pay phone. Plaintiff used the phone to call the clerk of the District Court and to call the office of his appointed counsel, Paul Flynn ("Flynn").

Plaintiff also had access to the Jail's law library during his detention. Records show that during his detention, Plaintiff was charged for copies in the Jail's law library on five separate days in November and December 2010 and January 2011. The Jail maintains a policy for inmate access to the library, under which all inmates have access to library services. Inmates are permitted access to the current Wisconsin Statutes, the United States Code, and limited case law via a computer database. Access to the legal computer is permitted on a first-come basis and limited in duration and frequency based on demand. Inmates may also obtain specific legal information through written request to the Jail's staff.

During his detention at the Jail, Plaintiff was transported to Chicago on seven occasions for hearings associated with *Diaz*. These trips—which occurred on November 15, 16, and 19 and December 29, 2010, and January 11, 13, and 27, 2011—are discussed in more detail below. During all of these trips but one (November 19), Plaintiff was transferred to the custody of the United States Marshals Service. Each time he returned to the Jail following his hearings and meetings, Plaintiff underwent a strip search pursuant to Jail policy to ensure that he did not possess any contraband. Plaintiff was not informed of the purpose of the strip search prior to any of these searches.

Plaintiff had his initial appearance before Magistrate Judge Denlow on November 15, 2010. Plaintiff was appointed counsel from the Federal Defender, Flynn, to represent him at his arraignment. Flynn advised the court that another lawyer in his office was representing one of the underlying defendants in the *Diaz* case and that at some point in the afternoon he would identify a panel attorney to represent Plaintiff in his place.

Kubiatowski states in a declaration that prior to the November 15, 2010 hearing, he spoke with Plaintiff and Flynn and told them that he was advised that ICE was planning to deport

Plaintiff, and they discussed Plaintiff's options. According to Kubiatowski, one option they discussed was that Plaintiff could agree to remain in custody of the Marshals while an attempt was made to resolve his immigration issues with ICE. Alternatively, if Plaintiff was released from the Marshals' custody before the immigration issues were resolved, Plaintiff would have to be returned to ICE custody. Because of the attendant threat of deportation, Plaintiff would first have to be deposed in the *Diaz* case in order to preserve his testimony. According to Kubiatowski, Plaintiff expressed that he did not want to be deposed and that he preferred to remain in the Marshals' custody and try to resolve his deportation issues. Plaintiff, citing his deposition testimony, denies that this conversation happened and maintains that he and Kubiatowski only "exchanged [a] couple words." [243] at 5. Specifically, Plaintiff testified:

> Q.     Other than that conversation on January 27, are there any other conversations you remember with Mr. Kubiatowski that you had? I'll ask you separately, your attorneys are a separate issue, but that you were involved with.
>
> A.     One time I believe it was the first hearing it was him and we waiting for Mr. Flynn to appear and we talk couple words, I don't recall what we talk about, but he, after that, he said that he cannot talk to me because he was representing the government.
>
> Q.     Other than him telling you he couldn't talk to you because –
>
> A.     He talked to me for a little bit and then he stopped it.
>
> Q.     Do you remember what he talked to you about?
>
> A.     No, I don't recall.

[237-1] at 36:24-37:16.

At the arraignment hearing on November 15, 2010, Kubiatowski advised the court that Plaintiff was a cooperating witness who had been recently arrested by Immigration and Naturalization Services and was facing imminent deportation proceedings. Accordingly, he needed to be kept in custody because if he were released, ICE would take him back and deport

him. Magistrate Judge Denlow ordered that Plaintiff be detained pending a detention hearing, which he set for November 19, 2010.

On November 18, 2010, Plaintiff was told that he had tested positive for tuberculosis. (He had not tested positive for tuberculosis earlier when he was in the custody of Dodge County.) Plaintiff refused to undergo any additional medical evaluation, and he was placed in isolation at the Jail. Plaintiff was unable to attend the November 19, 2010 detention hearing because the U.S. Marshals Service would not accept him until he was completely cleared of having tuberculosis. Instead, Plaintiff remained in the custody of the Ozaukee County Sheriff's Department transport team, shackled and handcuffed. Magistrate Judge Denlow, on his own motion, cancelled the November 19 hearing. The court later reset the hearing for January 11, 2011.

Plaintiff started a hunger strike on January 4, 2011 based on complaints that he had allegedly been in the Jail for two months with no court dates, no known case number, and no judge handling his case and because he wanted information about his legal status. Plaintiff terminated his hunger strike after one day after speaking to a mental health counselor and deciding to go back to general population and begin eating again. The Jail had a system in place for receiving grievances and complaints from detainees. Detainees could submit written grievances or complaints through an Inmate Request Slip, which would be forwarded to the appropriate department or section of the Jail. Plaintiff submitted only one Inmate Request Slip.

Plaintiff was transported to Chicago for a hearing before Magistrate Judge Denlow on January 11, 2011. Between his November 15, 2010 and January 11, 2011 hearings, Kubiatowski did not file any biweekly reports with the Court pursuant to Federal Rule of Criminal Procedure 46(h)(2).[6] That rule provides: "An attorney for the government must report biweekly to the court,

---

[6] Plaintiff alleges this fact in his Rule 56.1 statement. Kubiatowski denies the allegation on the basis that it is not supported by a citation to evidence. Although Plaintiff did not technically comply with Rule 56.1,

listing each material witness held in custody for more than 10 days pending indictment, arraignment, or trial.  For each material witness listed in the report, an attorney for the government must state why the witness should not be released with or without a deposition being taken under Rule 15(a)."

At the January 11, 2011 hearing, the court granted an oral motion by Flynn to withdraw as counsel and Ronald Clark ("Clark") was substituted as counsel for Plaintiff.  The court also asked when the *Diaz* case was expected to go to trial, and Kubiatowski advised the court that it was expected that the case would resolve by plea within the next couple of weeks.  Kubiatowski reiterated that the reason for the material witness warrant was that following Plaintiff's DUI arrest, INS had informed the FBI that it was going to deport Plaintiff.  Kubiatowski emphasized to the court that the prosecution did not want to keep Plaintiff in custody.  He explained that he had suggested to the FBI the idea of getting an S1 (informant) visa for Plaintiff but was told that would not happen.  Thus, the reason for Plaintiff's detention as a material witness was that the INS was insistent on deporting Plaintiff.  The court asked Kubiatowski to investigate and confirm whether there was still an INS detainer lodged against Plaintiff that created an imminent threat of deportation in the event that Plaintiff were released.  The court then continued the case for two days, until January 13, 2011, so that Kubiatowski could investigate the detainer issue.  The court returned Plaintiff to custody.

At the next hearing, on January 13, 2011, the court advised that pretrial services had issued a report and that it did appear that there was an active ICE detainer and warrant of removal against Plaintiff.  Kubiatowski advised the court that he had spoken with ICE and had been told that if

---

the Court will consider the fact alleged by Plaintiff to be undisputed because Kubiatowski admits in his summary judgment brief that "the explanations to the court of the reasons for Villar's detention were made orally at the status hearings; *there were not biweekly reports*."  [236] at 5 (emphasis added).

Plaintiff were returned to ICE custody, removal proceedings would begin again. The court asked Plaintiff's counsel for his view, and Clark responded by acknowledging that if Plaintiff were deported, this would deprive the defense in the *Diaz* case of a witness. Clark also observed that he could not force the government to help Plaintiff get an S1 visa. Judge Denlow then stated, "Here's my suggestion. . . . I think was should keep him in custody and, you know, let the government do what it's going to do as it relates to the criminal matter." [243] at 8. The court observed that in the meantime, Plaintiff could use this time to try to find somebody to deal with the immigration issues. The court asked Plaintiff's counsel if he agreed, and attorney Clark stated his agreement on the record. Plaintiff spoke up and observed that he wanted asylum because the people in the *Diaz* case were telling him that they wanted to kill him.

The case next came before the court on January 27, 2011. At that hearing, the government agreed to release the material witness warrant. Kubiatowski advised the court that it was apparent that the individuals against whom Plaintiff had agreed to cooperate were in fact going to plead guilty and that Plaintiff had advised that he did not expect to be deported right away. Kubiatowski stated that this was acceptable and that the United States would agree to release the material witness writ. Clark and Kubiatowski both explained to the court that Plaintiff would be released into immigration custody. Clark noted that Plaintiff had hoped for "something better" than just being released from the material witness warrant. He also noted that Kubiatowski had offered Plaintiff the option of staying in custody on the warrant. Clark explained, however, that "the three of us talked" and that Plaintiff had decided that he wanted to be released from the warrant. Accordingly, the court released Plaintiff from custody on the material witness warrant. The court ordered that Plaintiff was "released from custody as to this matter." [243] at 9. Judge Denlow stated, "[w]hatever immigration does, that's up to them." *Id.*

After the January 27 hearing, Plaintiff was returned to the Jail. He underwent a strip search upon his return. On February 1, 2011, Plaintiff was released from the Jail back into the custody of Lake County, where the DUI charge against him was pending. Plaintiff's detention in Lake County remained subject to an immigration hold, which applied in the event that the Lake County authorities should decide to release him. However, when Lake County released Plaintiff, they released him to the street. Plaintiff testified that he did not know why ICE had not taken him back into custody. Agent Roecker testified that Plaintiff was supposed to be transferred into ICE custody but that he was instead released. Plaintiff testified that during the time he was held as a material witness and continuing to today, he did not want to be deported back to Honduras.

Following his release, Plaintiff filed a complaint against Kubiatowski, the Ozaukee County Defendants, and a number of other individuals and entities. Kubiatowski and the Ozaukee County Defendants are the only Defendants remaining in the case. Currently before the Court are their motions for summary judgment on all remaining claims.[7]

## II.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by *** citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary

---

[7] At the outset of this litigation, the Court appointed a member of the Trial Bar to assist Plaintiff, see [12], but later allowed counsel to withdraw, see [13]. Plaintiff has capably represented himself since that time.

judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013) (citation omitted).

To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

## III. Analysis

### A. The Ozaukee County Defendants' Motion

Plaintiff brings three Section 1983 claims against the Ozaukee County Defendants. In his governing Complaint, Plaintiff alleges that the Ozaukee County Defendants violated (1) the Fourth Amendment (Count VI) by subjecting him to unreasonable strip searches upon his initial entry and subsequent reentries into the Jail; (2) the First and Fourteen Amendments (Count VII) by denying him access to the courts; and (3) the Eighth and Fourteenth Amendments (Count VIII) for arbitrarily incarcerating him for 84 days, humiliating, harassing and mistreating him, and cuffing, chaining, shackling, and strip searching him without reasonable suspicion.

The Ozaukee County Defendants move for summary judgment on all three claims. Plaintiff's response addresses only the Fourth Amendment claim. The Ozaukee County Defendants are entitled to summary judgment on the claims to which Plaintiff fails to respond. As to Count VII, "[t]he Constitution protects a prisoner's right of access to the courts; state actors must respect that right by not impeding prisoners' efforts to pursue legal claims." *Ortiz v. Downey*, 561 F.3d 664, 671 (7th Cir. 2009). "That right is violated when a prisoner is deprived of such access and suffers actual injury as a result." *Id*. The undisputed facts in the record demonstrate that the Ozaukee County Defendants did not impede Plaintiff's access to the courts or his ability to pursue any legal claims. Plaintiff does not dispute the Ozaukee Defendants' evidence that while Plaintiff was detained at the Jail, he had the ability to mail letters (without paying for postage) and did in fact send letters to the District Court, the U.S. Attorney's Office, and the Federal Defender's Office. Plaintiff also had access to a pay phone, which he used to call the clerk of the District Court and his attorney's office. Further, Plaintiff had access to the Jail's law library during his detention. The record shows that he made copies in the library on five occasions between November 2010 and January 2011. Plaintiff also had the ability to access state and federal statutes and limited case law, as well as the ability to obtain specific legal information from the Jail's staff via written request. Based on these undisputed facts, the Ozaukee County Defendants are entitled to summary judgment on Count VII of Plaintiff's complaint.

The Court now turns to Count VIII, which it construes as a claim for violation of the Fourteenth Amendment—which "applies to pretrial detainees"—rather than a claim for violation of the Eighth Amendment—which "applies to convicted prisoners." *Estate of Clark v. Walker*, 865 F.3d 544, 546 n.1 (7th Cir. 2017). "A pretrial detainee is constitutionally protected from undue punishment by the due process guarantee of the Fourteenth Amendment." *Solivan v. Dart*, 897 F.

Supp. 2d 694, 700 (N.D. Ill. 2012). The Ozaukee County Defendants have demonstrated that Plaintiff will be unable to present any admissible evidence to support his Fourteenth Amendment claim and therefore are entitled to summary judgment on Count VIII. See Fed. R. Civ. P. 56(c)(1). Plaintiff cannot establish that he was arbitrarily incarcerated in the Jail for 84 days because the undisputed record shows that the Ozaukee County Sheriff's Department had a contract with the Marshals Service under which the Jail housed federal prisoners, including Plaintiff. Plaintiff was incarcerated at the Jail pursuant to a material witness warrant that was approved and issued by Judge Castillo. Further, there is no evidence in the record to support Plaintiff's allegations that he was subjected to humiliation, harassment, or mistreatment at the Jail or any facts concerning the Jail's alleged cuffing, chaining, or shackling of Plaintiff. To the extent that Plaintiff bases Count VIII on the Jail's strip search policy, that claim is addressed below along with Plaintiff's Fourth Amendment claim (Count VI).

The Ozaukee County Defendants are also entitled to summary judgment to the extent that any of Plaintiff's claims are asserted against the "Ozaukee County Sheriff's Department" and the "Ozaukee County Department of Corrections." Plaintiff identifies these entities as parties in the body of his Complaint, see [175] at 5, but does not list them in the case caption. The Ozaukee County Defendants have demonstrated (and Plaintiff does not dispute) that the Ozaukee County Sheriff's Department is a department of Ozaukee County and not subject to suit individually, and that no entity exists by the name of the Ozaukee County Department of Corrections.

Having resolved the claims that Plaintiff does not address in his response brief, the Court now turns to Plaintiff's Fourth Amendment claim. In Count VI of his Complaint, Plaintiff alleges that it was not objectively reasonable for the Ozaukee County Defendants to strip search him when

he first entered the Jail and was returned to the Jail following his trips to Chicago for hearings and meetings because there was no reason to believe that he was hiding weapons or contraband.

The Ozaukee County Defendants move for summary judgment on this claim, based primarily on the Supreme Court's decision in *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318 (2012). *Florence* recognizes that "[c]orrectional officials have a legitimate interest, indeed a responsibility, to ensure that jails are not made less secure by reason of what new detainees may carry in on their bodies," because "[f]acility personnel, other inmates, and the new detainee himself or herself may be in danger if these threats are introduced into the jail population." 566 U.S. at 322. *Florence* also recognizes that jails have interests going beyond inmates concealing weapons and contraband, such as "[t]he danger of introducing lice or contagious infections" and detainees with "wounds or other medical injuries requiring immediate medical attention." *Id*. at 330-31.

*Florence* therefore requires that, in addressing constitutional claims challenging visual search procedures—and in particular procedures requiring "every detainee who will be admitted to the general population *** to undergo a close visual inspection while undressed"—the courts "must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security." 566 U.S. at 322-23; see also *id.* at 330 ("deference must be given to the officials in charge of the jail unless there is 'substantial evidence' demonstrating their response to the situation is exaggerated"). *Florence* rejected the proposition that certain detainees—including those who have "not been arrested for a serious crime or for any offense involving a weapon or drugs"—should be exempt from a standardized search procedure unless they give correctional officers "a particular reason to suspect them of hiding contraband." *Id*. at 334. The Court reasoned that the seriousness of a

detainee's offense is a poor predictor of who has contraband and that even persons arrested for minor offenses may be coerced by others into concealing contraband. *Id*. at 334-36. According to the Court, "[e]xempting people arrested for minor offenses from a standard search protocol thus may put them at greater risk and result in more contraband being brought into the detention facility." *Id*. at 336.

In this case, the undisputed evidence shows that the Jail maintains a policy of conducting a visual strip search of every individual who is entering the custody of the jail or has left custody and is returning from being held or housed by another entity. The purpose of this policy is to ensure a safe, secure, and hygienic environment. The Jail's policy does not distinguish between the types of detainees held in its general population and the Jail applies the policy to all general population detainees to maintain an orderly facility.

Plaintiff argues that he should have been exempted from the Jail's strip search policy because he was being held in the Jail on a material witness warrant, unlike the plaintiff in *Florence*, who was arrested for a minor offense (on an outstanding bench warrant after a traffic stop). Based on this distinction, Plaintiff contends that the Jail was allowed to search him only if it had particularized suspicion that he was hiding weapons or contraband. However, Plaintiff offers no evidence—let alone substantial evidence—that the rationales for the Jail's policy do not apply or apply with substantially less force to detainees held on material witness warrants. As the *Florence* Court recognized, exempting any detainees "from a standard search protocol *** may put them at greater risk and result in more contraband being brought into the detention facility," by making them targets of other inmates who wish to smuggle items into the Jail. 566 U.S. at 336. And apart from concerns about contraband, the Jail's hygienic concerns apply to all detainees, regardless of their offense level or whether they are suspected of having committed any offense at all.

The Supreme Court also rejected security risk distinctions based on the detainee's classification in at least one other case, *Bell v. Wolfish*, 441 U.S. 520 (1979). In *Bell*, the Supreme Court concluded that a policy requiring inmates at all federal Bureau of Prisons facilities—including pretrial detainees, convicted prisoners, "witnesses in protective custody, and persons incarcerated for contempt"—to expose their body cavities for visual inspection as part of strip search conducted after every contact visit with persons from outside the institution could be conducted without probable cause without violating the Fourth Amendment. *Id*. at 524, 559-60. Consistent with *Bell*, the Bureau of Prisons does not distinguish between material witnesses and other pretrial detainees in its rules for the care, custody, and control of pretrial inmates. See 28 C.F.R. § 551.100; 28 C.F.R. § 551.101(a)(1) (defining "pretrial inmate" as a "person who is legal detained but for whom the Bureau of Prisons has not received notification of conviction," and providing specifically that "a material witness is considered a pretrial inmate").

Plaintiff also argues that "Justice Alito's concurrence in *Florence* establishes an exception that 'precludes strip searches of all non-indictable detainees prior to their introduction in the general population,' regardless of whether that individual was arrested pursuant to a warrant." [239] at 16. In his concurrence, Justice Alito found it "important to note" that the Court was not holding "that it is *always* reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population." 566 U.S. at 341 (Alito, J., concurring). According to Justice Alito, "[m]ost of those arrested for minor offenses are not dangerous, and most are released from custody prior to or at the time of their initial appearance before a magistrate"; other arrestees have their charges dropped or "are released either on their own recognizance or on minimal bail" and "[i]n the end, few are sentenced to incarceration." *Id*. "For these persons," Justice Alito opined,

"admission to the general jail population, with the concomitant humiliation of a strip search, may not be reasonable, particularly if an alternative procedure is feasible," such as the segregation of temporary detainees who are minor offenders from the general population. *Id*. at 341-42.

Assuming that Justice Alito's concurrence is properly read to establish an exception, that exception would not apply to Plaintiff, who was detained "pursuant to a warrant," [239] at 16, whose detention was "reviewed by a judicial officer" on several occasions, and who was not ordered released after his first appearance in front of a judge. *Florence*, 566 U.S. at 341. Further, Plaintiff has not identified any evidence, beyond his speculation that the Jail could have put him in solitary confinement like they did when he was diagnosed with TB and when he went on a one-day hunger strike, that an alternative procedure for handling material witnesses is feasible.

Apart from arguing that *Florence* does not control the outcome of his claim, Plaintiff urges the Court to adopt the reasoning of *Al-Kidd v. Sugrue*, 2007 WL 2446750 (W.D. Okla. Aug. 23, 2007). *Al-Kidd* considered the constitutionality of a federal transfer center's ("FTC") policy of performing a strip search and body cavity inspection on all incoming and outgoing inmates, as the policy was applied to material witness detainees. In analyzing the defendant's qualified immunity claim, the Court concluded that the "the searches of Plaintiff and the manner in which they were conducted were not reasonably related to the FTC's security needs." *Id*. at *6.

There are a number of important differences between *Al-Kidd* and this case, which lead the Court to a different conclusion concerning the constitutionality of the Jail's search policy as applied to Plaintiff. As an initial matter, *Al-Kidd* was decided years before *Florence*—which this Court is bound to follow—and no courts have followed *Al-Kidd* in the eleven-plus years since it was decided. Factually, the Jail's strip search policy and the FTC's policy in *Al-Kidd* are not the same. The FTC performed strip searches and cavity searches of all inmates entering or leaving

the facility. There are no facts suggesting that the Jail performs cavity searches or searches inmates before they leave the Jail. Further, the stated rationales of the Jail's strip search policy and the FTC's policy in *Al-Kidd* are not identical. The FTC's only stated purpose for its policy was to prevent contraband or weapons from entering or leaving the facility. *Al Kidd*, 2007 WL 2446750, at *2. Here, it is undisputed that the Jail also has hygienic reasons for the policy (e.g., prevention of the spread of lice or disease). *Florence* recognizes these are legitimate reasons for a strip policy. See *Fonder v. Sheriff of Kankakee County*, 823 F.3d 1144, 1146–47 (7th Cir. 2016) ("*Florence* deemed the strip-search policy reasonable precisely because *every* arrestee going into the general population was examined for contraband, lice, disease, and gang tattoos. Searching half or two-thirds or four-fifths of the new arrivals will not prevent the introduction of lice or disease[.]"). Moreover, unlike Al-Kidd, Plaintiff does not identify any facts suggesting that the place and manner in which the Jail's searches were conducted were unreasonable. By contrast, in *Al-Kidd*, it was undisputed that Plaintiff was left naked in a shower for one and a half to two hours while other arriving detainees were processed, that he was required to sit naked on a cold floor in plain view of other detainees, and that he was required to be searched again the next day before being transported to a different state, even though he was held alone in a cell and had no contact with anyone in the interim. *Id*. at *1.

The Court recognizes that even if the Jail's policy, on its face, passes constitutional muster, a search conducted pursuant to the policy may nonetheless violate the Fourteenth Amendment rights of a pretrial detainee if it was "motivated by a desire to harass or humiliate" the detainee, rather than by "a legitimate justification," or if it is conducted in a "harassing manner intended to humiliate or cause psychological pain." *King v. McCarty*, 781 F.3d 889, 897–98 (7th Cir. 2015); see also *LaBoy v. Clements*, 2017 WL 2936705, at *13–14 (N.D. Ill. July 10, 2017). Here,

however, Plaintiff does not argue, and identifies no evidence in the record that would support a conclusion, that the Jail's searches of Plaintiff were motivated by a desire to harass or humiliate Plaintiff or were conducted in a harassing manner. Plaintiff does not, for instance, present any evidence that a search lasted longer than necessary, was performed in view of more Jail staff or inmates than necessary, or involved unnecessary touching. And it is undisputed that Plaintiff has no medical documentation to support his claims of psychiatric or psychological harm.

Based on the record before it, the Court concludes that Plaintiff has failed to come forward with sufficient evidence on which a jury could reasonably find that any of the individual Ozaukee County Defendants violated Plaintiff's Fourth Amendment rights. Plaintiff's *Monell* claim against the County, which is based on the same strip search policy and the same factual allegations, therefore must fail as well. See *Swanigan v. City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015) ("If the plaintiff fails to prove a violation of his constitutional rights in his claim against the individual defendants, there will be no viable *Monell* claim based on the same allegations.").

For these reasons, summary judgment is granted in favor of the Ozaukee County Defendants and against Plaintiff on all of Plaintiff's remaining claims against them (Counts VI, VII, and VIII).

**B.      Kubiatowski's Motion**

In his governing Complaint, as it has been narrowed by previous orders of the Court, Plaintiff brings *Bivens* claims against Kubiatowksi based on allegations that Kubiatowski violated the Fourth Amendment (Count I) and Fifth Amendment (Count II) by failing to submit periodic biweekly reports pursuant to Fed. R. Crim. P. 46(h)(2) to advise the court about the reasons for his continued detention. Kubiatowski previously filed a motion to dismiss these claims on the basis that they were barred by absolute prosecutorial immunity. The Court denied the motion to the

extent that Plaintiff alleged that, as a result of Kubiatowski's failure to file the bi-weekly reports required by Rule 46(h)(2), "the Court forgot about him after his November 19 detention hearing was continued" and Plaintiff "sat in jail for over two months until a detention hearing finally was scheduled, at which time he was ordered released." [98] at 26. The Court determined that the Seventh Circuit had not addressed whether absolute immunity shielded prosecutors from this type of allegation but that the Third Circuit had "recently ruled on an analogous set of allegations" in *Odd v. Malone*, 538 F.3d 202 (3d Cir. 2008), which the Court found persuasive.

Kubiatowski now moves for summary judgment on both of Plaintiff's claims. Plaintiff argues that the Supreme Court does not recognize Plaintiff's alleged implied constitutional tort remedy, which would extend *Bivens* liability into a new context. Kubiatowski also argues that Plaintiff's claims are barred by the doctrine of qualified immunity. Because the Court agrees that Plaintiff is entitled to qualified immunity, it finds it unnecessary to determine whether a *Bivens* remedy is available under the facts alleged here.

"The qualified immunity doctrine provides defendants immunity from suit, not just a defense to liability." *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Though it is an affirmative defense for pleading purposes, the plaintiff carries the burden of showing that defendants are not immune." *Id*. Kubiatowski has asserted qualified immunity, and therefore Plaintiff can proceed with his claim only if he can show both that (1) "the facts, taken in the light most favorable to [him], make out a violation of a constitutional right," and (2) the right "was clearly established at the time of the alleged violation." *Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2017).

The Court "may address these issues in whatever order seems best for the case at hand." *Sebesta*, 878 F.3d at 233. The Court may also "grant qualified immunity on the ground that a

purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). That is the course the Court will take here.

In order to show that the law was "clearly established," Plaintiff "bears the burden of showing that there is a case 'on point or closely analogous' that allows us to conclude that a reasonable government employee would or should know that [Kubiatowski's] conduct [wa]s unlawful." *Sebesta*, 878 F.3d at 234 (quoting *Boyd v. Owen*, 481 F.3d 520, 527 (7th Cir. 2007)). "The law is 'clearly established' when 'various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand.' " *Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) (quoting *Campbell v. Peters*, 256 F.3d 695, 701 (7th Cir. 2001)).

The Court looks first to controlling Supreme Court precedent and Seventh Circuit decisions on the issue. *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018). "If no controlling precedent exists, 'we broaden our survey to include all relevant caselaw in order to determine whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Id.* (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000)). Alternatively, in some "rare cases" the constitutional violation may be "patently obvious" and the plaintiff may not be required to identify any analogous cases, if he can show that "the defendant's conduct was 'so egregious and unreasonable that *** no reasonable [official] could have thought he was acting lawfully.'" *Id.* (quoting *Abbott v. Sangamon County*, 705 F.3d 706, 724 (7th Cir. 2013)).

Before determining whether the law was clearly established, "the right allegedly violated must be defined at the appropriate level of specificity.'" *Kemp v. Liebel*, 877 F.3d 346, 351 (7th

Cir. 2017) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). The Supreme Court has "repeatedly told courts *** not to define clearly established law at a high level of generality." *Kisela v. Hughes*, -- U.S. --, 138 S. Ct. 1148, 1148 (2018). Although there need not be "'a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id*. at 1152 (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (U.S. 2017)). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *White*, 137 S. Ct. at 551.

Neither Plaintiff nor Kubiatowski specifically define the constitutional right or rights that Kubiatowski allegedly violated. Given the lack of guidance from the parties, the Court finds it appropriate to define the relevant right as a right to periodic reporting by the prosecutor to the judge on the necessity of continuing to hold an individual on a material witness warrant. Plaintiff has not shown that this right was clearly established at the time of the alleged violation, at least in a case such as this one where this is no evidence that the prosecutor withheld facts that, if known by the court, would have resulted in the release of the detainee. All of the cases identified in the parties' briefs are from other circuits, fail to establish any clear trends in the case law governing Fourth Amendment claims, do not involve Fifth Amendment claims, and are distinguishable in significant ways from the case at hand.

Neither party has identified any cases that specifically involve a prosecutor's failure to comply with Rule 46(h)(2). The most closely analogous cases are *Odd* and *Schneyder v. Smith*, 653 F.3d 313 (3d Cir. 2011), both of which involved claims against state, rather than federal, prosecutors. *Odd* consisted of two consolidated Section 1983 appeals brought by individuals who were detained on material witness warrants to testify at criminal trials. In one of the cases, brought by Schneyder, the prosecutor failed to notify the judge who approved the plaintiff's detention that

the proceedings in which Schneyder was to testify had been continued for four months, despite the fact that the judge had directed the prosecutor to inform him of any delays in the proceeding and "made clear that he intended to release Schneyder in the event of a continuance." *Odd*, 538 F.3d at 205. In the other case, brought by Odd, the prosecutor failed to notify the presiding judge that Odd remained incarcerated after the case in which he was to testify had been dismissed. *Id.* at 206. In both cases, the plaintiffs were released immediately after the court learned they were still being detained. Both plaintiffs sued the prosecutors under Section 1983, alleging that they were detained without probable cause in violation of the Fourth and Fourteenth Amendments. *Id.* In one case, the district court granted the prosecutor's motion to dismiss on the basis of absolute immunity; in the other case, the prosecutor's motion to dismiss was denied. *Id.* at 207. The Third Circuit found that neither prosecutor was entitled to absolute prosecutorial immunity because the prosecutors' failure to notify the court that the reason for holding the plaintiffs as material witnesses had evaporated were administrative acts to which prosecutorial immunity did not apply.

*Odd* did not decide the ultimate issue of whether the prosecutors' actions violated the Fourth Amendment. And it did not consider any Fifth Amendment claim at all. Further, the facts of *Odd* are very different than this case. It was clear in both cases at issue in *Odd* that, but for the prosecutors' failure to report material factual changes to the presiding judges, the plaintiffs would have been immediately released. In this case, by contrast, there is no evidence that Kubiatowski's failure to file biweekly reports with the Court resulted in Plaintiff being detained for an unnecessarily prolonged period. The undisputed facts in the record show that Judge Castillo approved a material witness warrant for Plaintiff's arrest and Plaintiff was taken into custody at the Jail on November 10. Plaintiff had an initial appearance before Judge Denlow on November 15, at which Kubiatowski advised the Court that Plaintiff needed to be kept into custody to prevent

ICE from deporting him. Judge Denlow ordered Plaintiff to be detained pending his next hearing on November 19. It is true that the hearing was postponed due to Plaintiff testing positive for tuberculosis and that Kubiatowski did not file biweekly reports between November 19 and the next hearing on January 11. But once the parties were before Judge Denlow again, on January 11 and 13, 2011, the Court was advised that there was still an active ICE detainer and warrant of removal against Plaintiff. For that reason, the Government and Plaintiff's counsel agreed that Plaintiff should remain in custody and Judge Denlow ordered the detention to continue. When the case next came before the court, on January 25, 2011, Kubiatowski advised the court that the defendants in *Diaz* were going to enter guilty pleas and agreed with Plaintiff's attorney that it would be appropriate to release Plaintiff into immigration custody at that time. Judge Denlow therefore released Plaintiff from the material witness warrant. There is no evidence to suggest that, had Kubiatowski been filing biweekly reports during this time, Plaintiff would have been released any sooner.

In *Schneyder*, the court affirmed a denial of qualified immunity in one of the cases at issue in the earlier-decided *Odd*. The Third Circuit held that, based on existing law, the prosecutor had "'fair warning' that she had a duty to ensure that the incarceration of an innocent person was at all times approved by a judicial officer," which she breached when she "took it upon herself to decide that Schneyder ought to be incarcerated well past the point at which explicit judicial authorization had expired," as the judge who approved Schneyder's detention "had announced his intention to let Schneyder go if the trial date were moved, but [the prosecutor] took the position that 'she should be held until she testified.'" *Schneyder*, 653 F.3d at 331.

This case is readily distinguishable from *Schneyder* because there is no evidence in the record to suggest that Kubiatowski should have known that Judge Denlow's authorization to hold

Plaintiff had expired at any point in time when Kubiatowski was failing to make biweekly reports under Rule 46(h)(2). Plaintiff's detention was approved by Judges Castillo and Denlow in November 2010. Shortly thereafter Plaintiff tested positive for tuberculosis. Kubiatowski was forthcoming at the next hearing, on January 11, that he expected the *Diaz* case to be resolved by plea agreement within a few weeks. Judge Denlow nevertheless found it appropriate to continue to hold Plaintiff until at least January 13 while it was determined whether ICE was still seeking to deport Plaintiff. And on January 13, the parties and the Court agreed that Plaintiff should remain in custody because there was still an ICE detainer and warrant of removal. When Plaintiff again appeared before Judge Denlow on January 27, 2011, Kubiatowski informed the Court that the defendants in the *Diaz* case were expected to enter guilty pleas and agreed that Plaintiff should be released from the material witness warrant, into ICE custody. Considering these undisputed facts together, it is apparent that Kubiatowski, unlike the prosecutor in *Schneyder*, "provide[d] the court with the information it needed to properly perform its adjudicative function" of determining whether the continued detention of Plaintiff was reasonable. 653 at 328.

Plaintiff cites to several out-of-circuit cases that require the arrest and detention of material witnesses to be supported by probable cause and to be reasonable in order to satisfy the Fourth Amendment. See *Al Kidd v. Ashcroft*, 580 F.3d 949 (9th Cir. 2009), *reversed and remanded*, *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074 (Sup. Ct. 2011); *Bacon v. United States*, 449 F.2d 933 (9th Cir. 1971); *Stone v. Holzberger*, 1994 WL 175420 (6th Cir. Jan. 6, 1994) (unpublished decision). Relying on these cases, Plaintiff contends that "[i]t is clear that if [he] had the opportunity to have his [detention] hearing on time" rather than being required to wait until January 27, 2011, "he would have the opportunity to get released within *** ten day[s]" of his initial detention. [242] at 10. Plaintiff further asserts that it is "absurd to think" that ICE would have detained him upon his

release from the material witness warrant since ICE knew "that he was a key witness [in an] ongoing federal prosecution." *Id*. However, the undisputed facts in the record show that Plaintiff's original detention was supported by probable cause and that once there was a material change in facts (the *Diaz* defendants expressed an intent to plead guilty), Kubiatowski informed the Court and Plaintiff was released.

Plaintiff was arrested pursuant to a valid warrant issued pursuant to valid statutory authority, 18 U.S.C. § 3144, to prevent him from being deported before he could testify in the *Diaz* prosecution. The Court has already dismissed any challenge to the validity of the arrest warrant. After his arrest, Plaintiff was detained pursuant to a lawful court order issued at his arraignment on November 15, 2010. Plaintiff has not demonstrated that more reports from the United States Attorney's Office as to the continued need for Plaintiff's detention would have provided the court with any new or different facts beyond those already provided in the application for the material witness warrant and explained orally at Plaintiff's arraignment on November 15. All these facts remained the same when the case was again called before the court on January 13, 2011 and Plaintiff's attorney, Kubiatowski, and the Court agreed that Plaintiff should remain in detention to prevent him from being deported. Further, despite Plaintiff's contention to the contrary, the undisputed facts in the record demonstrate that—at least as far as Judge Denlow and the parties knew—ICE did plan to detain Plaintiff if he was released from the material witness warrant. Plaintiff does not dispute that on January 13, 2011, the court advised that pretrial services had issued a report from which it appeared that there was an active ICE detainer and warrant of removal against Plaintiff, and Kubiatowski advised the court that he had spoken with ICE and had been told that if Plaintiff were returned to ICE custody, removal proceedings would begin again.

In short, Plaintiff has failed to meet his burden of showing that Kubiatowski violated his clearly established constitutional rights by failing to file biweekly reports under Rule 46(h)(2). Therefore, Kubiatowski is entitled to qualified immunity.

## IV.    Conclusion

For these reasons, the Court grants both the Ozaukee County Defendants' motion for summary judgment [231] and Kubiatowski's motion for summary judgment [235]. Judgment will be entered in favor of Defendants and against Plaintiff. Because this ruling resolves all remaining claims in the case, this civil case will be terminated.

Dated: March 12, 2019

_____
Robert M. Dow, Jr.
United States District Judge